UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| TERRY LARSON and JAYNE LARSON, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.   ) | CAUSE NO.: 2:20-CV-250-PPS |
| ) | |
| DAVIDSON TRUCKING, INC., and GARY ) | |
| EIDT, individually and as an employee, of ) | |
| DAVIDSON TRUCKING, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

This matter arises from an automobile accident in Valparaiso where one of the Plaintiffs, Terry Larson, sustained serious injury. Trial is set to begin on January 13, 2025. In advance of trial, the Parties have filed numerous motions challenging the anticipated testimony of one another's expert witnesses on various grounds. Here I deal with Defendants' request to exclude the testimony of Larson's economic expert Dr. Stan Smith [DE 64.] For the reasons I discuss below, Defendants' request to exclude the testimony of Larson's economic expert is DENIED.

## Legal Standard

The treatment of expert testimony changed dramatically when the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) made judges instead of juries the principal gatekeeper of expert testimony. The case led to an important amendment to Federal Rule of Evidence 702. The Rule now authorizes testimony by a witness who is "qualified as an expert by knowledge, skill, experience,

1

training, or education" where (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." *Downing v. Abbott Labs.*, 48 F.4th 793, 808-09 (7th Cir. 2022) (quoting Fed. R. Evid. 702).

There's a three-step process in determining the admissibility of expert testimony under Rule 702: I must (1) review the proffered expert's qualifications; (2) then look at the reliability of the expert's methodology; and (3) determine its relevance. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

Step one evaluates, as Rule 702 provides, the expert's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. At step two, concerning reliability, courts may evaluate the following non-exhaustive list of factors: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam*, 877 F.3d at 779 (quotation and citation omitted). Finally, at step three courts evaluate whether "the expert testimony will assist the trier of fact." *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019). This entails evaluation of "whether the proposed scientific testimony fits the issue to which the expert is testifying." *Id.* One of my important roles as the gatekeeper is to be careful that the

opinion isn't just some "ipse dixit" of the expert—telling me something is true just because the expert says so when it is unmoored from the underlying data. *United States v. Owens*, 18 F.4th 928, 941 n. 5 (7th Cir. 2021).

As the party seeking to introduce the testimony, Larson has the burden to show, by a preponderance standard, that Dr. Smith's testimony meets the *Daubert* standard. *Downing*, 48 F.4th at 809. Importantly, "[t]he rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F.Supp. 2d 1104, 1110 (N.D. Ill. 2005) (quotation omitted).

## Discussion

Larson identified Dr. Smith in his initial expert disclosures on September 21, 2021. [DE 26-1 at 3–4.] Larson disclosed that he expected Dr. Smith to testify "regarding the economic harm caused by the injuries that Plaintiff suffered as a result of the April 30, 2020 crash. Dr. Smith's economic analysis addresses Plaintiff's loss of income and loss of household services." [*Id*. at 3.] Larson's September 2021 disclosure included an initial report from Dr. Smith dated September 20, 2021. [DE 72-1 at 2–15.]

Dr. Smith later provided an updated report dated August 4, 2023. [DE 70-1.] In his August 2023 report, Dr. Smith listed two categories of expert testimony: (1) an estimate of Larson's loss of wages and employee benefits and (2) an estimate of Larson's loss of housekeeping and household management services. [DE 70-1 at 1.] To reach these conclusions, Dr. Smith reviewed the following materials:

(1) the individual tax returns for Terry and Jayne Larson from 2015 through 2022; (2) the S Corporation tax returns for Larson-Danielson Construction from 2015 through 2022; (3) the W-2s for Terry Larson from 2015 through 2022; (4) the Complaint; (5) Plaintiff, Terry Larson's Answers to Defendants' First Set of Interrogatories; (6) Plaintiff, Terry Larson's Supplemental Answers to Defendants' First Set of Interrogatories; (7) Plaintiff, Jayne Larson's Answers to Defendants' First Set of Interrogatories; (8) the deposition of Terry Larson taken on August 31, 2021; (9) an informational interview with Terry Larson dated September 10, 2021; and (10) the case information form.

[*Id.* at 2–3.]

Dr. Smith noted that he relied upon Larson's statements concerning his employment history, future plans, and the effects of the accident on Larson's ability to work.[1] For example, Larson reported to Dr. Smith that Larson "had no plans for retirement at the time of his injury" and would have continued his role in his co-owned family construction company "beyond age 70." [*Id.* at 4.] Larson reported to Dr. Smith that prior to the accident Larson worked 45 hours per week and paid himself an annual salary of approximately $200,000. [*Id.*] Dr. Smith reported that Larson still worked at the construction company (as of his August 2023 report) but "started to work less hours at the beginning of 2022 as a result of his injury." [*Id.*] Dr. Smith noted that Larson also had reported a shift from being a full-time, salaried employee to being a part-time, hourly employee by 2023. [*Id.*] Larson reported to Dr. Smith that Larson planned to continue working on a part-time basis until the "end of summer 2025." [*Id.*]

---

[1] Dr. Smith's research assistant conducted two informational interviews of Larson. The first occurred on September 10, 2021, and the second occurred on July 18, 2023. [DE 64-1 at 10.] Dr. Smith did not attend either interview.

4

As far as methodology, Dr. Smith stated he relied upon data from the National Center for Health Statistics to estimate Larson's remaining life expectancy. [*Id*. at 2.] Dr. Smith then outlined his use of data from the Bureau of Labor Statistics and the Federal Reserve for "past wage growth, interest rates, and consumer prices" to generate an estimated real wage growth rate of 0.95% per year, real discount rate of 1.20% per year, and annual inflation rate of 2.51%. [*Id*. at 3.]

Dr. Smith also outlined his methodology for calculating Larson's estimated loss of tangible housekeeping chores and household management services using Bureau of Labor Statistics data, information collected from the interviews of Larson, and practices recommended by economist Dr. Gerald Martin. [*Id*. at 5–7.]

The crux of Defendants challenge to Dr. Smith's expected expert testimony occurs at step two of the three step *Daubert* / Rule 702 analysis. Defendants challenge the methodology of Dr. Smith's opinions and allege that they lack foundation in sufficient facts and data. Defendants do not challenge Dr. Smith's qualifications (step one) or the relevance (step three) of his opinions. I also do not see any issues with Dr. Smith's qualifications and find that his anticipated testimony is certainly relevant to the case at hand. Accordingly, I will focus on step two of the *Daubert* / Rule 702 analysis as it applies to Dr. Smith's proffered expert opinions.

I will first evaluate the scope of Dr. Smith's proposed testimony as this will guide the resulting analysis. Larson argues that Dr. Smith's testimony is narrowly confined to the question of Larson's economic loss. [DE 70 at 6–7.] According to Larson, the scope of Dr. Smith's testimony does not include "testifying on the cause of [Larson's] economic

5

loss", which Larson asserts is the April 30, 2020, accident. [*Id.* at 6.] Larson asserts that it is permissible for economic experts to assume the fact of injury and calculate economic loss based on that assumption. [*Id.* at 7.] Defendants argue that while Dr. Smith "may be qualified to offer testimony as to the amount of an alleged economic loss", he lacks a sufficient factual basis or reliable methodology to testify that Larson "suffered an economic loss related to the April 30, 2020, automobile accident." [DE 72 at 10.]

In Reply, Defendants take this a step further and appear to argue that because Dr. Smith assumes that Larson is no longer able to work in a full-time capacity, his testimony is "nothing more than speculation as to when and why Mr. Larson will retire." [*Id.* at 7.] In further refinement of their argument, Defendants argue that Dr. Smith's testimony lacks any evidence that Larson is "unable to continue working in his prior occupation." [*Id.* at 8.] In Defendants' eyes, there is a missing connection between the data Dr. Smith relied upon (Larson's allegations concerning his inability to continue working in the same capacity as before the accident) and Dr. Smith's opinion (which calculates lost wages and earning capacity).

A review of the relevant case law cited by the Parties confirms that Dr. Smith may provide expert testimony concerning estimations of lost wages and household services. In *Grostefon v. Cintas Corporation No. 2*, as here, the court considered a motion to exclude expert testimony concerning lost household services and earning capacity. No. 2:19-cv-00141, 2021 WL 4894895 (S.D. Ind. Sept. 29, 2021). The expert used information provided by plaintiff's counsel, a phone interview of the deceased plaintiff's wife, and various statistical methods to calculate the estimated lost wages and

6

household services. *Id*. at *1. The defendant objected to this testimony because the expert did not review the deceased plaintiff's medical records and alleged that the expert improperly considered the plaintiff's wife's statements concerning the plaintiff's physical fitness and intention to continue working. *Id*. at *2. The court rejected the defendants challenge as an attack on the data the expert chose to rely upon instead of the "actual methodology used." *Id*. at *3.

Two additional examples are illustrative. In *Estate of Warner v. Wellpath*, the court considered a motion to exclude similar testimony, from the same Dr. Smith, on the basis that the expert failed to account for the plaintiff's prior work history, history of incarceration, periods of unemployment, and reduced life expectancy caused by her substance abuse. No. 1:19-cv-00774, 2021 WL 12310134, at *2 (S.D. Ind. Nov. 8, 2021). Again, the court rejected the challenge to the expert testimony because it attacked only the quality of the expert's data and not his methodology. *Id*.

Finally, the court in *Kaepplinger v. Michelotti* rejected a challenge to a vocational economists' testimony concerning loss of lifetime earning capacity that relied on information provided by the plaintiff, a neuropsychological evaluation, and statistical data from a government agency. No. 17 CV 5847, 2022 WL 267886, at *11 (S.D. Ind. Jan. 28, 2022). Once more, the court concluded that these challenges went to the testimony's weight and not its admissibility. *Id*. at *15 ("That Mr. Gibson relied on certain data sets over others, or made certain assumptions about Ms. Kaepplinger's future ability to work, or what investment vehicle to use, are all factual assumptions and determinations that go to the weight of his testimony, and not its admissibility.")

These cases are all clear that challenges to the inputs that an economic expert relies upon to prepare testimony on lost earning capacity do not prohibit the admissibility of that testimony. Rather, these challenges attack the weight of the evidence and are reserved for cross-examination at trial. S*ee Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact") (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Indeed, the Seventh Circuit in *Manpower, Inc.* counseled that district courts usurp their role as gatekeepers for expert testimony when they take issue not with an expert's methodology, "but rather his selection of certain data from which to extrapolate" in applying that methodology. *Id.* at 807. That is precisely what Defendants ask me to do here.

Defendants' attempts to distinguish this line of cases is unpersuasive. Defendants seek to distinguish *Kaepplinger*, *Grostefon*, and other cases on the basis that they involved different types of experts (such as a vocational expert, which Dr. Smith is not), relied upon a review of different records, or relied upon medical provider testimony to establish a foundation for the physical impairment. [*See* DE 72 at 9–10.] None of these factual differences on the margins move the needle in Defendants' favor or change the fact that Defendants' arguments challenge only the quality of the data and not the methodology of Dr. Smith's approach.

During his deposition, Dr. Smith acknowledged that he assumed the information Larson provided to him was accurate and incorporated that information into his report.

8

[DE 64-1 at 13.] Dr. Smith said it was up to "the trier of fact to give . . . whatever weight to [Larson's statements] they believe is appropriate." [*Id*.] He also indicated the limited nature of his testimony as focused on calculating decreased earning capacity and not on the cause of that decrease in earning capacity (be it personal choice or the accident). [*Id.* at 24–25 ("I'm only documenting what his decrement and capacity is. And I will leave it up to the trier of fact to determine [the cause] . . . . I am not a liability expert. And so I don't disagree with you, it's important to determine how these losses arose, that's not my job."]

That said, there were several instances in his deposition where Dr. Smith walked the line and appeared to opine on the cause of changes to Larson's earning capacity. [*Id.* at 26 ("And [Larson's company] made some decision to pay him hourly as a result of his tragic injuries."] To the extent that Dr. Smith acknowledges the statements made by Larson that he relied on for his calculations, that is permissible. But I agree with Defendants that Dr. Smith lacks the foundation to testify as to the truth of those assertions or that the accident in fact caused Larson's reduced earning capacity. Those opinions are prohibited. In any event, I understand from Larson's representations to the court that Dr. Smith will not testify concerning the causation of Larson's alleged injuries.

In sum, Defendants' arguments primarily concern the weight of Dr. Smith's testimony, which are arguments best pitched not to the judge, but to the jury. This is because when evaluating a motion to exclude expert testimony, my job is to analyze the admissibility of an expert's testimony and not the weight to give that testimony.

9

*Manpower, Inc.*, 732 F.3d at 806 ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed."). As I have discussed above, Larson has established a sufficient basis for the admissibility of Dr. Smith's testimony limited in scope to a calculation of Larson's alleged economic loss. Dr. Smith may not testify as to causation because, as Defendants argue and as I have discussed above, he lacks sufficient foundation to do so.

## Conclusion

For the aforementioned reasons, Defendant's motion to exclude the testimony of Larson's economic expert Dr. Stan Smith is DENIED [DE 64.].

**SO ORDERED**.

ENTERED: December 2, 2024.

/s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**